NORCAL FDC, but most banks whose loans defendant AW regularly guarantees without the above special purposes funding or "affirmative action" eligibility criterion and standards.

92.     Upon first contact with defendant AW, contract negotiations between Plaintiff and defendant AW began with Plaintiff's initial request for $25,000 business credit. At the first in-person meeting, Defendant AW led the Plaintiff to believe that Defendant AW had the authority to approve Plaintiff's request for a $10,000 micro loan with defendant LCD. Defendant AW, as LCD board of director/board member, maintained or represented to Plaintiff that he maintained authority to promptly approve and extend the LCD small business micro loan. Contract negotiations settled and closed on this new lesser amount of $10,000.

93.     This lower amount, defendant AW assured Plaintiff, was the best approach due to the fact that LCD offered an ongoing contractual relationship including, inter alia, business support services, access to reputable national bank capital as derived from the LCD member bank collective, ongoing credit resources, financial management services, whereby, as the contractual relationship with LCD continued to mature, access to even greater capital over and above $25,000 including Property, Plant, and Equipment loans, commercial and residential, such as opportunity for homeownership would be included and made available.

94.     Plaintiff gladly accepted this contract of pre-approval on the LCD micro loan of $10,000, with attached 100% collateral guarantee through NORCAL FDC, and the contract relationship with defendant LCD for business support services, continuing credit access and opportunities, and attached long term prospective economic advantage offered by defendant LCD as executed by defendant AW.

95.     At the first in person meeting with defendant AW at the NORCAL FDC office at The Rotunda Building, 300 Frank Ogawa Plaza, Oakland, Ca 94612, Plaintiff offered defendant AW Plaintiff's business plan, tax information, credit history, an oral presentation as to the nature of Plaintiff's self-employment which Plaintiff sought to grow and expand into a profitable small business, professional resume and significant experience in the field of endeavor to be funded, business card, and a professional reference pertaining to the type of business of the Plaintiff, known to both defendant AW and Plaintiff.

96.     All of the above factors were received as favorable and accepted by defendant AW.

97.     Plaintiff was determined eligible and qualified per the above merits, criterion, standards, and definitions of Federal and State statute by defendant AW to receive a small business micro loan for $10,000 to allow Plaintiff to grow his self-employment into a small business as described in Plaintiff's business plan reviewed by defendant AW. Defendant AW approved the loan as the assent to contract and execution of the contract was executed on all of the above principles and basis.

98.     Defendant AW offered that in a day or two, he would have defendant AC, the LCD microfinance manager contact Plaintiff to set an appointment to fill out the paperwork for the LCD $10,000 loan, guaranteed by defendant NORCAL FDC, and to engage the additional LCD contract relations and services described above. Defendant AW also offered that if there were any problems, to contact him and let him know, and that he would take care of everything and that there should be no problem in getting the loan and contractual relationship with LCD extended before the end of the year 2006.

BLAA vs. LCD -                                                                              42

99.     Plaintiff is a reasonable man.

100.    Defendant AW's words and assertions were understood as importing a long term and continuing promise, contract, contractual relationship, credit expectancy, business expectancy, and a significant and prospective economic advantage. Plaintiff relied on these words and assertions by AW.

101.    The object of the contract was simply for Plaintiff to fill out the paperwork, receive the $10,000 micro loan and access to LCD support services et al as part of the contractual relationship with defendant LCD by which credit expectancy, business expectancy, and a significant and prospective economic advantage would most assuredly be achieved as described in Plaintiff's business plan and by other LCD clients whose contracts were not terminated or breached.

102.    Good consideration was had for the promise by defendant as the opportunity to fulfill its business, charter, mission, and responsibility to Federal and State statutes, among them the SBA Act, the ECOA et al, as a non-profit corporation specifically constructed to serve low income communities and socially and economically disadvantaged individuals in "fostering greater levels of job creation and retention", and by compensation as employees, officers, directors, funder/investors, guarantors, member banks of the defendant LCD member bank collective, and other entities receiving consideration and benefit from contacts held by the defendants.

103.    Defendant NORCAL FDC is in the business of guaranteeing small business loans with special consideration to socially and economically disadvantaged individuals seeking funding towards small business ownership. Defendant AW regularly, during the course of his employment as NORCAL FDC

vice president, guarantees or provides "collateral(s) of guaranty" for business loans by defendant LCD, the defendant "LCD member bank collective", local banks throughout the nine San Francisco bay area counties, and other small business lending sources and entities.

104.   Plaintiff is informed and on the basis of that information, believes that regular compensation may also be given by defendant NORCAL FDC to defendant AW and defendant LCD per the number of small business loans extended to eligible persons in a given timeframe.

105.   Plaintiff has performed all obligations to the defendants except those obligations Plaintiff was prevented or excused from performing.

106.   On March 20th, 2007, upon NOTICE OF ADVERSE ACTION by LCD, AW breached his contract with Plaintiff by failing to arrange for LCD to extend the $10,000 micro-loan and other LCD services. Further, AW breached his contract with Plaintiff by failing to impel LCD to perform per AW's contract with Plaintiff before the end of the year 2006. After March 20th, 2007, AW failed to reverse the NOTICE OF ADVERSE ACTION after being informed by Plaintiff of said adverse action where AW had made promise to correct any LCD failure to perform on his contract with Plaintiff. Plaintiff was damaged through detrimental reliance on this promise, especially through the delay in definitive conclusion – May 16th, 2007 - that AW would fail to perform on his contract.

107.   As further proximate result of AW's breach, Plaintiff suffered damages including humiliation, embarrassment, emotional distress, mental anguish, economic duress, out-of pocket money losses, severe injury to credit reputation, loss of business expectancies and prospective economic advantage, cost and expense of attempting to mitigate damage caused by the wanton, malicious, and oppressive discrimination and reckless disregard for Federal Law and statute involved in the denial of credit and breach of contract.

108.    Plaintiff is entitled to attorney fees by statute of 42 U.S.C. § 1691e.

WHEREFORE, Plaintiff prays:

   1.) For actual damages in the amount of $16,453;

   2.) For general damages in the amount of $93, 109;*

   3.) For special damages - loss of earnings, credit, and earning capacity;

   4.) For statutory damages in the amount of $10,000;

   5.) For exemplary or punitive damages;

   6.) For attorney's fees, and costs of the suit herein incurred; and

   7.) For such other and further relief as the court may deem proper.

* On theory of opportunity for revenues lost in 2007 & 2008 described in Plaintiff's marketing plan: $41,762 + $51,347 = $ 93,109.  Albemarle Paper Co. vs. Moody 422 US 405.

## FIFTH CAUSE OF ACTION
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

109.    Plaintiff incorporates all previous paragraphs herein alleged by reference as if fully set forth.

110.    Plaintiff alleges the above Cause of Action in subsidiary and corollary form and function to

Plaintiff's second Cause of Action for Breach of Contract as per State of California Law and recognized

tort actions.

WHEREFORE, Plaintiff prays:

   For actual damages in the amount of $16,453;
   For general damages, $93, 109;
   For special damages: loss of revenues, credit, and earning capacity.
   For exemplary or punitive damages
   For costs of the suit herein incurred; and
   For such other and further relief as the court may deem proper

# SIXTH CAUSE OF ACTION
BREACH OF FIDUCIARY DUTY with Plaintiff - Count 1
Violation(s) of California Corp C §§ 50 (1975), 5231(a), 5250, 17231(a), 9241(a), CC § 1714(a)
and US Federal 42 USC § 14503(f).

111.   Plaintiff incorporates all previous paragraphs herein alleged by reference as if fully set forth.

112.   A definition of a fiduciary and fiduciary relationship goes as follows:

    A.   **The term "fiduciary" refers to anyone who holds a position requiring trust, confidence, and scrupulous exercise of good faith and candor. It includes anyone who has a duty, created by a particular undertaking, to act primarily for the benefit of others in matters connected with the undertaking.**

    B.   **A fiduciary relationship is one in which one person reposes trust in the faithful integrity of another, who as a result gains superiority or influence over the first person; it is a relationship in which one person is under a duty to act for the benefit of another on matters within the scope of the relationship.**

113.   At all times during this complaint, defendants are fiduciaries and maintain a fiduciary relationship with low and lower income, socially and economically disadvantaged micro-credit borrowers.

114.   Defendant(s) is at all times during this complaint, a Microfinance Institute extending micro-credit loans per Federal and State Law and Charter as described and defined above to low and lower income, socially and economically disadvantaged individuals.

115.    Plaintiff is at all times during this complaint, a socially and economically disadvantaged individual per Federal and State Law, definition, rule and regulation as described above, seeking small business ownership opportunity as described by the Small Business Act et al Federal and State Law.

116.    The above listed Federal Law and charters, rules and regulations clearly and purposely maintain a US Government interest in preserving not only the equality and opportunity of small business ownership in general, but with particular attention for socially and economically disadvantaged individuals seeking business ownership opportunities through the operation and purpose of the defendants.

117.    Defendants regularly receive federal and state funding, grants, and collateral guarantees for the specific purpose of supporting the Federal and State social and economic interests, such as entering into contract with Plaintiff and similarly situated individuals, with special attention to low-income areas and neighborhoods.

118.    Plaintiff resides in a low-income area and neighborhood.

119.    Defendant(s) and defendant associates, agents, members, and partners – as listed per defendant's website – regularly receive Federal and State tax credit benefits for extending funding, collateral guarantees, and other products and services to the defendants towards the above described social and economic purposes regularly engaged by the defendants.

120.    Plaintiff has information and belief, and thereon alleges that the above described defendants et al associates receive other, and additional, compensation and benefit personally, individually, and collectively.

121.    Due to the nature of the specialized business activities of the defendants, a stricter statutory standard of care than the CC § 1714(a) requirement to use ordinary care and skill in managing their persons and property applies to the defendants, particularly as Micro Finance Institution and State of California special and specific purpose corporation.

122.    Defendants under Federal and State charter, for social-economic purposes of interest of, and in part, on behalf of, the US Federal Government and State of California, did and do act under the color of state law.

123.    Defendants owe a fiduciary duty to the US Government to advise and administer the US Congressional and State of California Legislative intent of the Equal Credit Opportunity Act and CA CODE Section 14002 to individuals, such as the plaintiff, whom the ECOA et al was designed to protect and support.

124.    Defendant was induced to believe and expect through contract and promise described above, that defendants would provide confidential financial management and business support services for the Plaintiff.

125.    On December 26th, 2006, defendants accessed Plaintiff's confidential credit and financial information, history, and records in trust of applicable consumer credit law and policy.

126.    On this basis, as WC et al Defendants accessed and controlled Plaintiff privileged and confidential credit, financial, and tax information, and as such, US Consumer Credit Laws impel upon the Defendants a duty to protect Plaintiff's confidential information and to maintain truthful standards under the US Truth in Lending Act et al, a special confidential relationship and duty was and is duly created.

127.    Plaintiff met and conferred with defendant WC and defendant DM in person, separately, on one and only one occasion each, to discuss confidential matters of credit, finance, self-employment, tax information, business, and business planning of the Plaintiff.

128.    Plaintiff met and conferred with defendant AW in person on more than one occasion to discuss confidential matters of credit, finance, self-employment, tax information, business, and business planning of the Plaintiff.

129.    The very nature of the business of private investigations in addressing and operating within the confines of privacy and the avenues of freedom of information is based in privilege and confidentiality, and upon receiving plaintiff's privileged and confidential marketing plan, adds an additional fiduciary element and dimension, owed to the plaintiff by the defendants.

130.    Plaintiff regularly communicated with defendants AW, AC, WC, DM, EW, Citibank as member bank/Citibank officer Susan Roberts as board of director of Defendant LCD, in regards to the confidential

BLAA vs. LCD -                                                                                    49

matters of credit, finance, self-employment, tax information, business and business planning of the

Plaintiff, as well as complaint of all of the tort matters alleged throughout this complaint.

131.    Plaintiff did receive return communication from defendants AW, AC, WC, in regards to the

confidential matters of credit, finance, self-employment, tax information, business and business planning

of the Plaintiff, as well as complaint of the entire tort matters alleged throughout this complaint.

Defendants EW and DM NEVER returned Plaintiff's communication, even when urged and requested by

Plaintiff, and even as the very serious and compelling nature of the matters of this complaint

communicated to them impelling and/or requiring a communication or response in good faith from the

defendants EW and DM.

132.    Defendants EW and DM are both white. Plaintiff is African-American.

133.    Discrimination by race, class, and other personal motives, biases, motivations of defendant DM

most certainly have interfered with the defendants' fiduciary duty to themselves as a public benefit

corporation, the general public, and the Plaintiff.

134.    Citibank, as LCD member bank and LCD board of director, specifically received in person

communication, on more than one occasion, from Plaintiff with respect to the confidential matters of

credit, finance, self-employment, tax information, business and business planning of the Plaintiff, as well

as all of the tort matters alleged throughout this complaint, but failed to assist, inquire, and/or prevent the

matters alleged in this complaint from occurring.

135.    The relationship with the defendants at all times throughout this complaint did involve the handling, and mishandling, of Plaintiff's personal, privileged, confidential information, and complaint, before, during and after December 26th, 2006.

136.    The defendants did breach their fiduciary duty with the Plaintiff which has directly contributed significantly to the damages suffered by Plaintiff alleged throughout this complaint.

Defendants' negligent supervision of themselves as officers, employees, agents, associates, members, and directors, as a corporation and corporate operation including the defendants' credit scoring system, the defendants' credit applicant evaluation system, complete failure to comply with standards of care articulated by **California Corp C §§ 5231(a), 17231(a), 9241(a),** the irrationality of their actions in failing to resolve the matters alleged in this complaint brought to their attention diligently and comprehensively have constituted an utter and complete failure of fiduciary duty.

137.    Further, as described through the above allegations, the defendants have similarly violated **California Corp C §§ 50 (1975), and § 5250.**

138.    Such above alleged violation is breach of the charitable trust to which the defendants are bound. As a charitable California Corporation, defendants owe a fiduciary duty to the general public and/or class of individuals that the California Corporate charter, and US Department of the Treasury Charter of the Defendants was designed to support and protect, impelling such duty upon the defendants. In failing to uphold the above given standards, charter, and public charitable trust, Defendants breached its duty to broad public interest and collective legal interests of the people and to the plaintiff.

139.    The above alleged fiduciary relationship and duty in the context of the relatively new function, purpose, identity and definition of the defendants, and entities or institutions like the defendants, as Microfinance Institutions and Microcredit programs, is a new and unique relation and duty in the context and mechanization of the Microfinance Industry, and surely represents a special and confidential relationship and duty, and a "fiduciary" and/or "fiduciary-like" relationship and duty.

140.    The above breach of fiduciary duty has caused Plaintiff mental strain and emotional distress, and in trusting that the Defendants would act with diligence, professionalism, respect and appreciation for Plaintiff's business and economic circumstances, when in fact they did not, but instead acted against such trust and presumptive relationship based on trust has caused profound and severe financial harm in parallel to such emotional distress caused by said breach.

WHEREFORE, Plaintiff prays:

    For actual damages in the amount of $16,453

    For general damages, $93,109;

    For special damages - loss of revenues, credit, and earning capacity.

    For exemplary or punitive damages

    For costs of the suit herein incurred; and

    For such other and further relief as the court may deem proper.

BLAA vs. LCD -                                                                52

# SIXTH CAUSE OF ACTION, cont'd

BREACH OF FIDUCIARY DUTY among Defendants
Causing damage to Plaintiff - Count 2
Violation of the Davis-Sterling Act (CC §§ 1350-1376 et al.)

140.    Plaintiff hereby incorporates all previous paragraphs herein by reference as if fully set forth.

141.    Defendants maintain a fiduciary duty among themselves as prescribed in **Corp C §§ 5231(a) and 7231(a), Corp C §§ 309 and per the Davis-Sterling Act CC §§ 1350 – 1376.**

142.    Defendant LCD and its board of directors maintain and share authority and duty, including duty of inquiry, with other entities and individuals as prescribed by **Corp C §§ 5210 and 7210.**

143.    In all acts alleged in this complaint, defendants did breach their fiduciary duty among themselves, particularly in failing to honor, and uphold the authority and contract of LCD board of director Defendant AW extended to the Plaintiff.

144.    With particularity and a specific failing of fiduciary duty, Defendant DM, WC, and AC failed to carry out the order of director defendant AW to honor the contract extended by defendant AW to Plaintiff.

145.    LCD member bank and LCD Board of director Citibank failed to inquire into matters of Plaintiff's complaint with defendant LCD and LCD executive director and Defendant EW.

146.    Defendant EW failed in his corporate fiduciary duty as prescribed by **Corp C §§ 50 (1975)** which states:

**"A director may not close his eyes to what is going on about him in the conduct of the corporate business and, if he is put on notice by the presence of suspicious circumstances, he may be required to make such "reasonable inquiry" as an ordinarily prudent person in his position would make under similar circumstances."**

147.    Similarly, Defendant EW has further failed in his corporate fiduciary duty as a community association as prescribed by **The Davis-Sterling Act (CC §§ 1350-1376)** which states:

"A nonprofit director's fiduciary duties include the duty of care, the duty of inquiry, the duty of loyalty, the duty to comply with investment standards, and, for community associations, duties imposed by **the Davis-Sterling Act (CC §§ 1350-1376)"**

148.    Defendants are a charitable trust as per **Corp C §§ 5250**, and have failed in its fiduciary duties not only to its members but also to the general public to which the Plaintiff belongs.

149.    Defendants failed in their fiduciary duty to the corporation in failing to maintain compliance with the US Federal Law and State of California Law in violating the **Equal Credit Opportunity Act 15 USC §§ 1691 et seq, et al., and the Unruh Civil Rights Act CC §§ 51 et al.,** respectively, with respect to the mishandling of the Plaintiff's contract and in regards to the confidential matters of credit, finance, self-

employment, tax information, business and business planning of the Plaintiff, as well as all of the tort matters alleged throughout this complaint.

150.    As a result of the above, the defendants have breached their fiduciary duty in violating **42 USC §§ 14503(f)** through the acts which have involved misconduct for which have violated the above state and federal civil rights law against the Plaintiff.

151.    Defendants have breached their fiduciary duty through liabilities arising from, in particular but not limited to the intentional, wanton, or reckless acts, gross negligence, fraud, oppression, and malice of LCD business advisor and defendant DM, also described in Corp C §§ 5047.5 and applicable to the defendants.

152.    Defendants may have violated their own formal code of conduct for directors, officers, and employees, which many non-profit corporations, similar to the defendants, have adopted in trend influenced by **the Sarbanes-Oxley Act of 2002 (15 USC §§ 7201-7266)** to address and combat malfeasance in corporations.

153.    In light of the US Federal importance of the industry and purpose that the defendants operate under, receiving government, national and international bank funding, national and international press, all the while acting under the color of state law, an  absence of a defendant corporate code to address unscrupulous acts and malice, conflicts of interest, and self-dealing, business ethics, fiduciary duties and responsibilities would be a gross negligence and profound disregard and violation of corporate fiduciary duties.

154.    The breach of fiduciary duty by the defendants allowed for the willful misconduct, reckless misconduct, gross negligence, fraud and deceit, conspiracy, discrimination, non-compliance with federal and state law, and conscious flagrant indifference to the civil rights of the Plaintiff and all acts alleged during and throughout this complaint.

155.    Had it not been for the breach of fiduciary duty between defendants, and particularly towards defendant AW in failing to honor contract as extended by defendant AW, as well as towards the Plaintiff, the allegations of this complaint and damages would have been avoided.

WHEREFORE, Plaintiff prays:

    For actual damages in the amount of $16,453

    For general damages, $93, 109;

    For special damages - loss of revenues, credit, and earning capacity.

    For exemplary or punitive damages;

    For costs of the suit herein incurred; and

    For such other and further relief as the court may deem proper.

# SEVENTH CAUSE OF ACTION

TORTUOUS INTERFERENCE - Devin McAlpine

Intentional or **Tortuous Interference** with: 1.) Contract, **2.)** Contractual relationship, **3.)** Credit expectancy, **4.)** Prospective economic advantage, and **5.)** Business expectancy.

156.    Plaintiff incorporates all previous paragraphs herein by reference as if fully set forth.

157.    The above 5 counts of this fourth cause of action all duly represent a probable or reasonable likelihood of a prospective future and continuing economic benefit or advantage for the Plaintiff. Defendant AW does not receive paid employment as an employee from Defendant Plaintiff relied on Defendant AW's contract him as being created inside the authority and scope of his professional relationship with Defendant LCD/Opportunity Fund.

158.    However, Defendant AW's implied contract with Plaintiff for a guarantee of good faith and fair dealing in his credit application process stood in full effect.

159.    As a matter of practicality, and "implied code of conduct", Defendant AW did have influence over Defendant AC to enforce or ensure an approval in Plaintiff's application for credit, but not over Defendant DM as Defendant AW later explained to Plaintiff.

160.    On a basis of discrimination by race, Defendant DM interfered with the above implied contract(s) between Defendant AW and Plaintiff.

161.    Defendant DM acted outside the stated scope of his employment, that of "business advisor" by interfering with the implied contract with Defendant AW, and the credit application decision process which rested under the scope of Defendant WC's employment as a "loan consultant".

162.    DM's personal motives, biases, and motivations, discrimination, and apparent corporate self-dealing, constitute 3rd party interference against not only the plaintiff, the Plaintiff's contract with AW, the authority of AW as LCD board member, but against a corporate lending policy established by LCD before DM arrived at employment with LCD.

163.    The original LCD policy towards serving African-Americans towards the development of their communities, small businesses, and homeownership among LCD's many services described as business and credit expectancies previously throughout this complaint, was at 31% in 2004.  This has been a consistent figure and policy since 1999, yet in 2005, when DM joined LCD, the percentage of African-Americans served fell to 27% in 2006 and fell to 10% in 2008. This describes the very real opportunity for interference by a single individual acting in discrimination.

164.    Defendant DM did discriminate against Plaintiff on the basis of race, due to personal motives, biases, and motivations and in so doing acted outside of the course and scope of his LCD employment as employee officer of the corporation whose title is "business advisor" represented to function as a service to LCD credit applicants and clients. Under the guise of business advisor promising business and financial advice, through coercion, undue influence, and conspiracy DM did cause adverse action and denial against Plaintiff's expected $10,000 loan as planned through contract with AW. Thus, DM did interfere with Plaintiff's contract with AW to arrange for an LCD $10K loan, and the above counts which

duly represented a probable or reasonable likelihood of a prospective future and continuing economic

benefit or advantage for the Plaintiff.

165.    As previously alleged, Plaintiff entered into contract and a contractual relationship with defendant

AW, as board of director of defendant LCD, and as Vice President of defendant NORCAL-FDC, to

arrange for LCD to extend a small business micro-loan of $10K from defendant LCD, and the LCD

member bank collective, guaranteed by defendant NORCAL FDC per State of California Department of

Technology, Trade, and Commerce Agency's Office of Small Business and the US Small Business

Administration chartered, funded, and directed as a certified Community Development Entity (CDE) and

per the US Small Business Act, Federal and State code and regulations. The contract and contractual

relationship between Plaintiff and AW, and NORCAL FDC was entered into per the California State

Loan Guarantee Program, US Federal Code 15 USC §§ 631 et seq, advertised LCD small business

support services for socially and economically disadvantaged individuals and entrepreneurs, and direct

contract effect and relationship extended by AW as a California non-profit corporation LCD board of

director.

166.    LCD support services include access to capital, credit and financial management services, access

to credit, business advice, business support services, homeownership financing or access to

homeownership financing thereof, access to revolving credit and homeownership financing and financial

support services, estate planning, access to LCD client/recipient roster for various business services and

support, et al LCD programs and services providing a prospective and continuing economic benefit and

advantage, and other miscellaneous LCD business and credit support services and advice.

167.    With the above LCD services per contractual relationship with AW, and the LCD member bank collective, Plaintiff has a valid business expectancy to achieve financial projections, marketing and operations objectives/milestones described in detail in Plaintiff's business and marketing plans, which present **a reasonable and probable likelihood of future economic benefit for plaintiff.**

168.    Defendant DM is, and at all times was, aware of the contractual relationship, contract, and business expectancies described above, and acted outside of the scope of his employment in discrimination against plaintiff and AW in order to interfere with plaintiff's contract with AW.

169.    To the degree that   DM acted upon directive and/or policy of member banks and board of directors, DM acted inside the scope of his employment.

170.    To the degree that defendant member banks and board of directors affected a directive and policy of discrimination, acting in violation of banking and civil rights Law, member banks did interfere with Plaintiff's contract with AW.

171.    Plaintiff and defendant AW, LCD board of director/board member, are both African-American, while defendant DM, "LCD business advisor" is white.

172.    Not only were DM's wrongful acts directed against plaintiff, but were enacted to defeat and circumvent AW's authority and influence with LCD. Thus, Defendant DM discriminated against both AW and Plaintiff on the account of race, whereby such discrimination accounted for action outside the

scope of DM's employment with LCD, and on this basis, proceeded to interfere with plaintiff's contract with AW.

173.    Thus, Defendant DM intentionally and unlawfully interfered with the 1.) Contract with AW; 2.) AW sponsored Contractual relationship with LCD; 3.) Credit expectancy;  4.) Prospective economic advantage;  and 5.) Valid Business expectancy by the following wrongful and unlawful acts, without justification, described below:

- (i) Causation of Denial and/or induced the breach of the AW contracted
        business loan for $10K, through violation of 42 USC §§ 1691 et seq,
        and 15 USC §§ 631 et seq, et al.;

- (ii) Refusal to extend AW contracted LCD business, credit, and financial
        management support services described above;

- (iii) Complete indifference and conscious disregard of Plaintiff's civil
        rights, particularly exercised under the Consumer Credit Act, and
        Equal Credit Opportunity Act, inter alia, the Small Business Act;

- (iv) Discrimination by race and class;

- (v) Fraud and Deceit;

- (vi) Conspiracy to interfere with Plaintiff's civil and credit rights;

- (vii) Undue Influence and constructive fraud;

- (viii) Intimidation and Intentional infliction of emotional distress.

174.     The above wrongful and unlawful actions of Defendant DM, first and foremost, and subsequent undue influence over Defendants AC, WC, EW, LCD, LCD member bank collective, AW, et al defendants, were specifically aimed at the Plaintiff, the Plaintiff's business, the contract and contractual relationship executed between the Plaintiff and AW/LCD/NORCAL FDC. Both AW and the Plaintiff are African-American. Defendant DM sought to injure the Plaintiff, the Plaintiff's business, and the above described expectancies as a result of defendant DM's personal motives, bias, and motivations, foremost among them discrimination by race and class, and other suspect or invidious motives currently under investigation by Federal, State, and private authorities.

175.     Defendant DM resented the contract relationship between two African-Americans as Plaintiff brought this to contract relationship to DM's attention, a 100% collateral guarantee of the loan requested.

176.     Out of spite, and other personal motives, biases, and motivations, including retaliation against Plaintiff asserting a 100% collateral guarantee by an LCD affiliate manager and authority – AW and NORCAL FDC - DM sought to maintain control of the LCD credit scoring and evaluation system in support of his plot, scheme, pattern and practice of discrimination based on race, with a further added resentment that an African-American was and is an LCD board of director/advisor/loan committee member, and sought adamantly to injure or sabotage the above described contract, contractual relationship et al expectancies.

177.    It appears DM's influence has shaped LCD policy through a subtle pattern and practice of discrimination as there are NO African-Americans on LCD's staff since DM arrived at LCD.

178.    During the year 2004/2005, the year that Defendant DM became employed as business advisor with Defendant LCD, to the current year 2008, Defendant LCD's service to African-American loan applicants/clients/recipients dropped from 31% to 10% of total social and economically disadvantaged business owners and/or total business owners served by Defendant LCD.

179.    Had it not been for the interference of Defendant DM, the above wrongful and unlawful acts, beginning with the breach of contract and contractual relationship, Plaintiff would have received the personal, professional, and economic benefits and advantages of 1.) The $10K business loan guaranteed by AW/NORCAL; 2.) The contractual relationship with LCD, the LCD member bank collective, and the above described LCD services; 3.) Access to continuing and revolving credit; 4.) Prospective economic advantages of successful small business ownership and business opportunity, including US Government contracts, as described by 15 USC §§ 631 et seq.; 5.) Valid Business expectancy described in Plaintiff's business and marketing plans. All of which lead to Probable or reasonable likelihood of a prospective future and continuing economic benefit or advantage.

180.    The above wrongful and unlawful actions of defendant DM, occurring January 2007 to May 2007, caused and forced Plaintiff to divert energy, time, focus away from generating business revenues, in order to minimize and dissuade the attack and injury by the defendants against the Plaintiff all the while exercising federal consumer credit and civil rights to stop the wrongful and unlawful acts of the Defendants, and particularly defendant DM.

181.    The wrongful and unlawful actions of defendant DM outside of the course and scope of LCD employment caused a termination of the AW authority and contract, contractual relationship, and above described expectancies, and thus arrested the Plaintiff from operating the Plaintiff's self-employment. The termination and willful failure to consider the AW contract, AW sponsored contractual relationship, and above described expectancies caused significant financial harm to the Plaintiff as previously alleged heretofore.

WHEREFORE, Plaintiff prays:

     For actual damages in the amount of $16,453;

     For general damages in the amount of $93,109;

     For special damages - loss of revenues, credit, and earning capacity.

     For exemplary or punitive damages

     For costs of the suit herein incurred; and

     For such other and further relief as the court may deem proper.

# EIGHTH CAUSE OF ACTION

CONSPIRACY

**Complaint [Code Civ.Proc.§ 425.10] for Compensatory [Civ.Code § 3333]**

**and Punitive or Exemplary [Civ. Code § 3294]**

**Damages for Injury Based on Conspiracy**

182.   Plaintiff incorporates all previous paragraphs herein alleged by reference as if fully set forth.

183.   Conspiracy is at the basis and foundation of the recent threat and risk of financial collapse in the American economy. The US Government and tax-payers have committed to $700 Billion dollars to address this potential financial meltdown and the mortgage foreclosure crisis, and $25 Billion discussed as a bail out for the American Auto Industry. Greater regulation is what is being purported to be the plan and method of US economic policy to recover and to scrutinize failed vision and management as well as the wrongful acts of officers and executives – conspiracy being among these wrongful acts and reasons for the current crisis.

184.   The above described conspiracy alleged herein at all times during this complaint is no different then the aggregate financial crisis and a thematic of the need for change. Therefore this individual complaint represents hope and a profound look into the factors of conspiracy, and the potential threat and damage to economic structure and development that such conspiracies may cause, and into the opportunity to defeat such threats and damage in favor of economic growth and prosperity.

185.   Defendants have conspired against Plaintiff individually, collectively against African-Americans, and have conspired to misrepresent the nature and message of the entire Microfinance industry at all times during this complaint and report.

186.     On or about Jan 4th, 2007 defendant DM, first and foremost as conspiratorial progenitor in concert with defendant WC, primarily, and later defendants AC, EW et al defendants all knowingly and willfully conspired and agreed among themselves to discriminate against plaintiff on a basis of race and class; to induce failure in plaintiff's business, financial health, credit and earning capacity; to deceive, defraud, and coerce plaintiff into accepting defendant's conspiracy; to evade compliance with the ECOA 42 U.S.C §§ 1691 et seq. to the detriment of plaintiff's rights, interests and business concerns; to inflict emotional distress and/or "burn out" upon the plaintiff, all in simultaneous conjunction with the malicious interference, delay, alteration, and denial of plaintiff's contract, contractual relationship, credit and business expectancies, and prospective economic advantage.

187.     The above alleged conspiracy to discriminate against plaintiff on a basis of race and class, did further include fraud, plot and scheme and through coercive power, deceit, duress, and menace upon plaintiff in attempt to force plaintiff into accepting, submitting to, and disregarding defendants wrongful and unlawful acts and attempts to evade compliance with Federal and State Law and substantial violation of the ECOA, first and foremost, and to conceal a larger and more pervasive pattern, practice, and policy of discrimination, socio-economic injustice, individual self-dealing, racketeering and illegal profit sharing, and other corporate financial corruption.

188.     The formation and operation of the above alleged conspiracy began and was fostered primarily by the willful and malicious acts, and personal motives biases and motivations of defendant DM.

189.     Plaintiff is uniformed of previous elements of formation and operation of conspiracy by the

defendants prior to DM involvement with LCD, pending further investigation, but has information and

belief and thereon alleges on said information and belief that certain elements of conspiracy were in

practice before the arrival of DM and the conspiracy fostered primarily by the willful and malicious acts,

and personal motives biases and motivations of defendant DM.


190.     Defendant DM, upon learning that Plaintiff was African-American, and thereon deciding to

discriminate against and deny plaintiff's contract, business and credit expectancies, sought first to

intimidate plaintiff, and second, sought through coercive power and undue influence to engage WC in the

above alleged conspiratorial actions against plaintiff, whereby WC had previously given every indication

and assurance to the plaintiff that plaintiff's credit application was being processed and completed and

would be extended before the end of 2006 or early January 2007.


191.     Defendant DM has and/or attempts to maintain an intimate pre-disposition, pattern, practice, and

personal history of coercive power, influence over Hispanic-Americans, and from this fact, the above

allegations, and other information, plaintiff believes and thereon alleges that had it not been for the

influence, persuasion, interference, and involvement of DM, the above described conspiracy would not

have fostered successfully.

192.    With respect to the civil wrongs of the conspiracy to discriminate; to defraud and deceive; to inflict emotional distress; to induce failure in plaintiff's business, credit, financial health, and earning capacity the elemental nature of the conspiracy followed a general framework consisting of the following essential forms, methodologies and actions: 1.) **ATTACK,** 2.) **DELAY,**  3.) **ALTER,** 4.) **DENY** 5.) **COERCE** 6.) **EVADE** *(Including misrepresentation, fraud & deceit)* 7.) **CONCEAL** 8.) **PLOT & SCHEME,** 9.) **NEGLECT,** 10.) **ELEMENT OF PERVASIVENESS.**

## ELEMENTS OF DEFENDANTS' CONSPIRACY (1 - 10)

193.    **1.) ATTACK.** The element of attack and challenge began with DM's personal motives, biases, and motivations on a ground of discrimination against plaintiff as soon as DM learned that plaintiff was African-American. Next, upon learning Plaintiff's personal and professional financial profile from WC, and of the nature of the plaintiffs' contract business concerns, pre-approved/contract status, and the NORCAL FDC 100% guarantee, during the time period of December 26th, 2006 through January 4th, 2007, DM prepared to meet plaintiff with a predetermined bias, prejudicial outlook, and judgment against plaintiff. Malicious interference is deemed an element of ATTACK as DM did maliciously interfere with Plaintiff's credit application and contract relationship.

194.    On January 4th, 2007, DM met with plaintiff for the first and only time. The meeting was antagonistic. At this first and only meeting with DM, DM attempted to belittle and intimidate the plaintiff as if DM appeared to believe, or attempted to make himself feel superior, and/or sought to create a sense or feeling of superiority over plaintiff because DM was white and plaintiff was African-American.

195.    DM was on a mission to attack and challenge plaintiff's contract through antagonism, creating an atmosphere of intimidation towards the plaintiff at this one and only January 4th, 2007 meeting.

196.    DM started off the meeting with an apparent warning, challenge, and attack against plaintiff, by stating: "Don't just think this deal is going to go through!" Bewildered, plaintiff offered that the loan was already 100% guaranteed; that his credit score – pulled by WC - was good at 656; that he had little or no debt; that he had worked hard in preparation for, and to be prepared for such a loan; that he had been employed in the business for over 10 years, self-employed for two of those years, for which he sought funding to turn and expand his self-employment into a business enterprise that could eventually create jobs; that he was licensed by the State of California and approved by the US Department of Justice (DOJ) and the Federal Bureau of Investigations (FBI) to operate such a business/occupation as qualified manager; and that his business plan was comprehensive with solid financials developed with assistance from SBA/SCORE.

197.    DM, in response, erroneously continued the theme of attack, challenge, and intimidation but now on plaintiff's choice of accountant for no apparent reason, nor on any basis or information at which DM could possibly know or rightfully challenge on such basis. This appeared very suspicious to plaintiff.

198.    DM went on to assert that he had nothing to do with the loan processing or decision process as if to throw off the scent of wrongdoing, and/or disguise his attack.

199.     Despite DM's assertions to plaintiff that he had nothing to do with the loan approval/decline process, it was clear at this meeting that DM attempted to gain a psychological advantage, authority, superiority and domination over Plaintiff and Plaintiff's contract. And in light of DM's refusal to acknowledge the authority of the execution of such contract by LCD board member AW, who is also African-American, it became apparent that DM sought to attack and challenge the authority of LCD board member AW, and his (AW's) authority to contract, and with this attack, DM sought to position for, and prepare an avenue for denial and sabotage of the plaintiff's contract, surreptitiously, out of a personal motive of racial bias and prejudice prior to and during the January 4th, 2007 first and only meeting and contact with defendant DM.

200.     This decision to conspire against plaintiff began also from a previous pattern and practice of conspiracy to discriminate, which centered around DM as well. From this pattern and practice of conspiracy to discriminate, DM had succeeded in manipulating the LCD system to suit his own individual and personal motives, biases, and motivations.

201.     DM sought to covertly challenge the authority of LCD board member AW who worked directly with AC in guaranteeing LCD loans through NORCAL FDC, and represented an aspect of LCD practice that DM could not directly control.

202.     The element of attack of the herein alleged conspiracy is also based in the power struggle and manipulative efforts of DM by and large, and in general, which would have come into direct challenge to the authority of AC, the LCD micro finance manager, who is Asian-American, and who had been

employed with LCD well before DM, and before there was an LCD pattern and practice of discrimination and conspiracy to discriminate against African-Americans.

203.   Next, after the element of ATTACK within the herein alleged conspiracy, came the element of DELAY of the conspiracy fostered by DM:

204.   **2.) DELAY.** (i) DM after refusing to read, review and/or receive plaintiff's 77 page business plan – which was developed with assistance, support, and advice form SBA/SCORE – DM demanded a shorter marketing plan from Plaintiff, not required by the LCD policy stated on LCD's application describing the approval/decline process which, as specifically stated on the LCD Micro Loan Application, takes only 2-3 weeks to complete and answer with either an approval or a decline. This demand by DM delayed the process with an unnecessary, unreasonable, and non-typical burden on plaintiff. Less than two weeks later, upon completion, DM NEVER responded to plaintiff's shorter marketing plan, further compounding and exasperating the DELAY.

(ii) After conferring over plaintiff as credit applicant and/or plaintiff's contract, and induced into conspiracy with DM, WC first failed to extend the $10K loan as promised on December 26th, 2006 by WC before the end of December 2006, and second, mysteriously lost or misplaced plaintiff's financials and requested that plaintiff re-send his confidential documents, as an excuse for DELAY...now becoming intentional.

(iii) DM failed to respond to Plaintiff's marketing plan. LCD Executive Director EW failed to respond to Plaintiff's marketing plan and correspondences. If a sincere or a true doubt to plaintiff's

business or business acumen existed, these could have been resolved or corrected through response, and question without DELAY. Yet neither DM nor EW ever responded to any of plaintiff's many correspondences extended in due diligence and good faith. Both DM and EW conspired to DELAY plaintiff's contract past the ECOA requirement of 30 days.

(iii)(a)Further, EW, after receiving plaintiff's business plan in April 2007, and having failed as of yet to respond to plaintiff's marketing plan and loan request and petition, is currently, at the time of the filing of this complaint, actively engaging in the conspiracy to DELAY answer to plaintiff's contract – now, over 1 and a half years later.

(iv) WC in February 2007 requested 2006 tax returns of plaintiff which were not due with the IRS until April 15, 2007 nor were these 2006 tax returns completed or available. On December 26th, 2006, WC already had in his possession the plaintiff's 2005 tax returns and 6 months of 2006 banking records. There is NO reasonable explanation for later requesting such forms or financial information already in WC's possession other than a conspiracy of intentional DELAY.

(v) WC requested profit and loss statements for 2006 in February 2007, even though WC had the raw data in the 2006 banking statements from plaintiff on December 26th, 2006. Again, the request is and was a DELAY tactic in furtherance of the conspiracy.

    1.) WC had already received 6 months of banking statements for 2006 from plaintiff.

    2.) The request for 2006 tax returns, and later, after much delay, a 2006 profit and loss statement, was completely unreasonable.

3.) The unreasonable request for a profit and loss statement for 2006 which could have been requested on December 26th, 2006, by WC, is further evidence of the undue influence and conspiratorial pursuits of DM.

(vi) AW after being informed of the DELAY and expressing anger due to the DELAY, failed to hold DM/WC accountable for said DELAY. AW expressed to plaintiff that he feared offending AC for reprimanding AC's apparent subordinates, and failed to reduce or stop the conspiratorial tactic of DELAY.

(vii) None of the above requests for additional documentation from plaintiff were reasonable or justified for a start-up business, and certainly not reasonable with respect to part-time self-employment seeking to be converted into a full-time small business. It is certainly not reasonable from perspective of a micro-finance and credit program and a community development organization servicing socially and economically disadvantaged small business owners with a 100% guarantee on a loan by government and quasi-government collateral. Such request for extra documentation by WC could not amount to anything less than a DELAY tactic for the purposes of furthering the defendants' conspiracy against plaintiff. A requirement for a business plan is NOT even mentioned on the LCD micro-loan application.

(viii) DM ordered all the unreasonable and conspiratorial requests as delay tactics against the plaintiff through WC while lurking in the shadows with WC being the face of the conspiracy. Plaintiff corresponded with WC during this time of DELAY, yet WC had no apparent authority or desire to make a decision without DM, contrary to the stated positions of both, from both, to the plaintiff.

(ix)  DM delayed the plaintiff's contract/credit application's NOTICE of ACTION over 75 days - 11 weeks against a stated LCD policy of 2-3 weeks to a NOTICE of ACTION, and in violation of the ECOA 30 day requirement or 4 weeks.

205.    The above described facts and factors allow for, achieve, and execute the conspiratorial tactic of DELAY as a foundational element of interference of self-dealing personal motives in concert with the herein described conspiracy.

206.    3.) **ALTER.** The defendant DM and WC altered plaintiff's contract on or about March 1st, 2007 after 60 days of delay, challenge, and interference, having no justifiable basis to reject plaintiffs contract, whether considered a contract or credit application by defendants DM and WC or not.

207.    When WC informed plaintiff by telephone that he and DM would extend $2,500 now or $10,000 after plaintiff could demonstrate that plaintiff make the projections of plaintiffs marketing plan that dm received but to which DM NEVER responded, let alone offering business advice which DM never did offer when requested despite his fraudulent assertions that 1.) He was available for business advice and 2.) Had nothing to do with the loan decision which was handled exclusively by WC as LCD loan consultant.

208.    The scenario of: 1.) $2,500 now or, 2.) $10,000 after 3-4 months of proving financial projections based on receiving the $10,000 up front, as is the purpose for requesting and receiving a start-up business loan, was a "pick your own poison" plot and scheme to attempt to destroy the plaintiff and plaintiffs business as described in plaintiff's financial projections and marketing.

BLAA vs. LCD -                                                                     74

209.    Both halves of the plot and scheme presented a fiendish scenario – "Damned if you do, and damned if you don't!". Being presented with this scenario as alteration to plaintiff's contract caused a great deal of emotional distress for the plaintiff.

210.    A plot and scheme as a false and deceitful offer, even if for the sake of argument, was to be considered an offer of 25% percent of the contracted or requested amount still comes after 60 days of delay which results in an accrual of damages. This 25% doesn't even cover the start up costs projected in the marketing plan. Starting a business on "thin air", without capital is a next to impossible task, let alone unreasonable. This alteration was designed by DM to induce failure in plaintiff and plaintiff's business.

211.    Projections of revenues are based on projections of cost and expense not one without the other. DM displays a failed and preposterous business sense and acumen and/or sinister, malicious personal motives, biases, and motivations. All are present with DM.

212.    A reasonable person would easily gather that if the projections were achievable on "thin air" – without start-up funding – Plaintiff would not have contracted with the defendants for $10K, or submitted himself to the humiliation, emotional distress and all of the wrongful acts of the defendants.

213.    Disturbed by the two "dead end" scenarios and alteration of his contract, plaintiff responded to WC with question in words to the effect: "...this is all DM's doing, isn't it?" WC replied, "Yeah, this was DM's idea. Plaintiff responded: "Send this presentation to me in writing and I will respond in writing. Plaintiff NEVER received an answer, to this effect, in writing from WC as plaintiff requested.

214.   The alteration was set-up in conspiracy, out of malice and spite, to induce the plaintiff to fail.

215.   The alteration was set-up in conspiracy to induce the plaintiff to fail, thereby creating a false ground from which to further solidify, establish, satisfy, and execute DM's conspiratorial motives, schemes, and mechanizations, and to foster, expand, and strengthen his conspiracy.

216.   **4.) DENY.** Alteration and neglect to prevent the conspiracy against plaintiff elevated to denial on March 20th, 2007 as dated on defendant notice of adverse action.  Plaintiff received the notice in early April 2007 at plaintiff's business address and immediately informed AW, AC and EW, in writing which expressed how the denial was wrongful, disturbing, humiliating, and in violation of the ECOA.

217.   AW spoke with AC; AC spoke with WC, EW, and DM.

218.   The denial or March 20th, 2007 NOTICE OF ADVERSE ACTION listed two reasons for denial:

   **"Lack of established earnings record.",** and

   **"Income insufficient for credit amount requested."**

219.   Plaintiff complained in full detail describing how the denial came in violation of the ECOA and that the personal motives, biases, and motivations of DM were to blame first and foremost.

220.   Plaintiff petitioned for reversal, and demanded that AW reverse the failure to uphold the contract LCD board member AW agreed to with plaintiff.

221.   Again, AW spoke with AC about the denial.

222.   On or about April 15th, 2007 AC called the plaintiff and explained that the denial was a mistake and that WC was directed by AC to extend a $2,000 credit builder loan product, right away.

223.   AC, after discovering elements of conspiracy and undue influence on WC from DM, offered that a misunderstanding was to blame in that a March 1st, 2007 email was sent describing the above alleged "pick your own poison" scenario maliciously conceived by DM and forwarded by WC - who confirmed that DM had devised, plotted and schemed the scenario - to plaintiff by telephone.

224.   The scenario, a conspiratorial plot and scheme for denial, and to induce failure in plaintiff to cover-up the need for a direct denial, was never mailed, even though plaintiff requested to receive this scenario in writing per his Consumer Credit Protection rights to which he would respond. NO reason for the scenario being presented after such long delay instead of the expected extension of the plaintiff's contract/ pre-approved credit application was offered by WC, even though plaintiff demanded such reason as per his Consumer Credit Protection rights.

225.   The plaintiff expressed dissatisfaction to WC, especially upon WC testifying that DM was behind the alteration and delay whereas DM had NEVER responded to plaintiff throughout this delay period as a

central element of the DM sponsored conspiracy, proving that a conspiracy against plaintiff had been in effect all the while, and at all times during, this complaint.

226.     This alteration scenario was the second overt act of the conspiracy after the element of attack and challenge which DM sought to cover-up and to conceal through fraud, deceit, and misrepresentation that the testimony of WC, in offering the alteration scenario, exposed and proved.

227.     The plaintiff's expression of dissatisfaction could have caused WC to fail to send the alteration scenario in writing, and upon relaying this dissatisfaction in a meet and confer conference or conversation with DM, in unified conspiracy, the decision not to mail an official written presentation of said alteration scenario was made to conceal any wrong doing or blatant non-compliance with the ECOA.

228.     Upon being made aware of plaintiff's dissatisfaction, AW's dissatisfaction, and the fact that plaintiff would protest the conspiracy to interfere with his civil rights, AC sought to cover-up the denial by which its very existence unfailingly presents evidence of an ECOA violation.

229.     AC engaged in fraud and deceit in "doctoring" an inter office email to forward to the plaintiff which was based on or occurred between WC, DM, and presumably AC, hoping that plaintiff would accept his "misunderstanding" representation and would not question the validity or truth of his representation.

230.    Plaintiff saw through AC's charade which attempted cover-up the March 20th, 2007 NOTICE OF ADVERSE ACTION as denial, displaying a clear overt act which unfailingly demonstrated AC's involvement, commitment, and support in furtherance of the DM sponsored conspiracy.

231.    AC realized that an official written denial on a contract executed by an LCD board member who regularly guarantees LCD loans through NORCAL FDC, and that there was NO reasonable or rational reason for the denial. And after clear and blatant ECOA violations including discrimination by his department under his watch, such a denial could not bode well in any circumstance.

232.    AC acted as if he hoped that the denial would disappear on its own, or through his subterfuge tactics, without having to officially reverse the denial, as the act to openly reverse a denial means that a denial would have actually had to exist, and so AC sought to hide the denial in much the same way a murder suspect attempts to hide a murder weapon.

233.    Plaintiff demanded a reversal of the denial which was executed on a ground of discrimination by race and class, and in violation of the ECOA's 30 day creditor answer requirement.

234.    The denial exposed and elicited AC's first overt act of conspiracy in concert with all other conspirators and co-conspirators.

235.    EW NEVER responded to the plaintiff's accusations of wrong doing in the denial of plaintiff's contract/credit application, even after being made aware of the conspiratorial acts of discrimination against the plaintiff.

236.   DM NEVER denied any of the plaintiff's accusations of wrong doing in the denial of plaintiff's

contract/credit application.


237.   Even as AC and AW admitted to plaintiff that LCD had committed an error, due to the above

described facts and factors, AC failed to reverse the wrongful denial which came as a result of a

conspiracy sponsored by DM to which AC became fully involved as a co-conspirator.


238.   At all times during this complaint, and in circumstances and events leading up to and after the

formation and operation of the herein described conspiracy, denial constitutes an overt act of

conspiratorial discrimination. In many or most instances further acts would require intensive investigation

to determine.


239.   **5.) <u>COERCE</u>.** On or about April 11th, 2007 AW after speaking with AC, yet fearful of speaking

directly to DM, as AW commented as much to plaintiff, who along with EW remained eerily silent and

removed in the background, throughout , from the efforts of AW and AC to "put out the fire" of the

ECOA violation that the conspiracy started by DM has caused, as both AW and AC and plaintiff were

aware of the ECOA 30 day required answer and LCD's written policy of approval/decline within 2-3

weeks.


240.   AW attempted to coerce plaintiff to accept the $2,000 LCD credit builder loan to cover up his

failure to perform on his contract and failure to prevent the DM sponsored conspiracy against the contract

AW executed by injecting duress onto plaintiff telling plaintiff that if he didn't accept the $2K loan he

wouldn't get anything from the defendants. Plaintiff did not accept this reasoning. Instead, Plaintiff

responded by explaining that the defendants conspired against plaintiff and to accept the $2K in light of precarious position would ensure failure not success.

241.    AW, taking side with AC, breaching his contract to arrange for LCD to extend the $10,000 micro-loan, to save his reputation which was at "risk" and "under fire" because of his failure to prevent the conspiracy against plaintiff in violations of Federal and State Law, joined the conspiracy started by DM and WC and subsequently cont'd by AC and EW.

242.    AW stated to plaintiff: 1.) "Take the $2,000 and they'll fund you the rest later", 2.) "Don't try to punish them because they made a mistake", and with respect to plaintiff petitioning LCD founder and Executive Director EW, 3.) "I'd be pissed off too if someone went over my head" - reference to mailing correspondence to executive director EW.

243.    Again, EW NEVER responded to plaintiff and so supported the conspiracy through neglect, negligent supervision of the LCD credit scoring system, the LCD application and applicant evaluation system, through the negligent supervision of LCD employees and the entire LCD system and operation that allowed such a malicious conspiracy to form and operate.

244.    Under pressure from coercion and duress to accept the $2,000 credit builder loan over 110 days from the beginning and execution of the contract for $10K, plaintiff considered the alteration of his contract out of desperation and coercions by AW.

245.   **6.) EVADE.**   Defendants attempt to evade compliance with ECOA in fostering their conspiracy. Evasion by defendants further comes through fraud, deceit, misrepresentation, plot, scheme, and a wrongful, unreasonable delay of NOTICE of ACTION in violation of the ECOA, in a concerted effort to cover and hide the tracks of a blatant and invidious effort to jeopardize plaintiff's contract, business and credit expectancies, prospective economic advantage, civil and consumer credit rights, and to cause severe financial harm, emotional and economic distress.

246.   The ECOA has offered the greatest protection to plaintiff, and those similarly situated to the plaintiff, "on paper" and to consumer credit applicants. Yet the defendants, by way of professional skill, ability, practice, and a "code of silence" which is enhanced through longevity of cooperation within the defendants' operation, in addition to the relative novelty of the micro-finance industry, and by way of a benevolent and misleading veil of a community development purpose, are able to successfully, if only temporarily, evade compliance with the ECOA.

247.   It has required an independent report of investigation and petition for redress of grievances from a professional who maintains standing to pierce the veil of evasion by the defendants, and similarly situated violators of the ECOA, which runs counter to US Congressional legislative intent, Federal and State Law, not to mention the defendants' own stated, published and advertised policies.

248.   Acting in the capacity of a quasi-government entity, a bank,  a social and economic development center, special purposes community development center, servicing socially and economically disadvantaged individuals through government charter and funding, the defendants are routinely

accustomed to non-scrutiny, or lax scrutiny, and have been able to successful evade compliance with

applicable Federal and State Law and regulations.

249.    It is imperative to examine the element of evasion as a critical factor and element of the

defendants' conspiracy at all times during this complaint.

250.    In evading compliance with the ECOA, at root is an even more pervasive underlying

conspiratorial influence. Defendants and their multi-layered affiliates, associates, members, partners, and

advisors do attempt, in the construction of the defendant MICRO-CREDIT entity, or MICROFINANCE

INSTITUTION (MFI), which is a special purposes lending and banking, community development, non-

profit, government chartered entity, to disguise and evade actions and policies taken under the color of

state law. LCD is not a bank and not subject to the same banking regulations to which a bank must

submit. Yet LCD acts as a veil to shield responsibility or compliance of LCD member banks.

251.    As the MICROFINANCE/MICROCREDIT industry is a burgeoning new and bold innovation

and market, Defendants and their participants seek to manipulate any perceivable grey area that may arise

in this new market economy and banking innovation, where the ECOA remains the only significant

regulatory statute yet was written into Law over 38 years ago before the MICROFINANCE Industry was

born. At all times during this complaint, Defendants have manipulated this discrepancy.

252.    In acting under color of state law as a quasi-government, banking, charitable, non-profit entity,

defendants aggressively bring in willing and anxious participants seeking to collect tax waivers from the

IRS per defendants' 501(c3) non-profit corporation status. The shear numbers of participants and global

press surrounding this new socio-economic banking industry innovation with the defendants representing

Silicon Valley and the greater bay area, creates a significant body of active, willful, and negligent

conspirators, aid and abettors, and supports of the defendants' operation, including those in supervisory

roles and functions with respect to the defendant's operation. The sheer volume of volume and diversity

of active supporters of the defendants operation provides disguise and cover, and a veil of EVASION.


253.    **1.) Misrepresentation, Fraud & Deceit.** (i) On or about April 30th, 2007, in an attempt to evade

compliance with LCD policies, ECOA requirements, rules and regulations, and to cover-up the delay

factor thus arrived at in discovery of DM and WC's conspiracy against plaintiff's application/contract,

AC did further attempt to deceive and misrepresent to plaintiff that WC had emailed an "offer" or reason

for alteration of plaintiff's contract/application to plaintiff on Thursday, March 1st, 2007. Plaintiff checked

his email history and inbox, but did not find an email sent from WC at or about this time March 1st, 2007.


254.    Doubtful of AC's representation, plaintiff requested that AC forward such alleged email that AC

represented to plaintiff that WC had emailed to plaintiff. On April 30th, 2007, AC forwarded the alleged

email from WC. It appears as if the email was sent as an inter-office memo from WC to AC. The

forwarded email does NOT show plaintiff's email address in the sent column, only the name in lower case

quotes of the plaintiff with NO email address, but does show DM's email address as a CC, and the email

of WC as sender of the email. Other emails between plaintiff and defendants display the email address of

the first party to whom the email was sent with or without the name of the party.


(ii) The second misrepresentation by AC to cover up the first misrepresentation came in response

to plaintiff's charge that as the email lists NO email address as being sent, this fact alone proves that the

email was never sent to the plaintiff. Plaintiff's email history and inbox does not and did not contain any such email from WC on or about this time, March 1st, 2007. AC in response claimed that "...what you see in the email below is the convention that Microsoft Outlook uses for an email address that is stored in your Contacts folder." However, this claim does NOT bear out. In all cases of emails sent between plaintiff and defendants, the first "sent to" party is listed with an email address in light of the convention that Microsoft Outlook uses for an email address that is stored in a given Contacts folder.

255.     Included in the chain of email responses between defendants and plaintiff, in every case, the first party to whom the email was sent displays the email first with NO name listed from a Contacts folder.

256.     The April 30th, 2007 forwarded email from AC rejects plaintiff's "loan application" listing only one reason for denial: "income insufficient for amount of credit requested", but does NOT list the March 20th, 2007 denial reason of "lack of established earnings record". The email suggests to plaintiff that after 10 weeks of DELAY, that plaintiff must re-apply for a $2,000 Credit Builder Loan or prove to defendants that after 3-4 months with $10,000 amount as a loan application on hold if plaintiff's business is meeting plaintiff's financial projections. This "pick your own poison" scenario communicated to plaintiff by phone but not in writing as plaintiff demanded, is absolutely preposterous, invidious, manipulative, and malicious!!

257.     In any case, it is highly irregular if not impossible that Micro Soft Outlook conventions list a name only in the original or leading sent party first whereas the first party as "CC" and "From" is listed with an email address, counter to AC representations. The quotation marks around the plaintiff's name are peculiar and out of step with normal Microsoft Outlook conventions.   It appears the email was either an

inter-office memo sent to AC by WC, in which AC erased his email address and typed in the plaintiff's

name without his email address by mistake, or the email was sent to another party or mistaken email

address whereby AC erased the email address and inserted the plaintiff's name while forgetting to insert

the plaintiff's email address. The email/memo itself is a tool of conspiracy in and of itself connecting

WC, AC, DM, and AW.


258.     This element of conspiracy through misrepresentation, fraud, and deceit by AC to cover-up the

wrongful acts of his subordinate WC, and the undue influence of DM, and the ongoing effort to conceal

the conspiracy, plot and schemes of DM, to evade ECOA compliance, accountability, and responsibility

while interfering with and denying plaintiff's contract/application firmly establishes AC as a co-

conspirator with WC and DM.


259.     **2.) Misrepresentation.** DM did represent to Plaintiff that he had no influence over the credit

application process or any direct decision or influential capacity over plaintiff's contract/application. The

true fact was that IT IS DM - in the role of business advisor - who did and does have complete and

unfettered authority of influence over the business credit application process. This misrepresentation by

DM sought to temper the perception of challenge, attack, and intimidation by DM at the January 4th, 2007

meeting. DM misrepresented to plaintiff that WC had complete unfettered authority, sans DM's influence,

over the LCD application process and plaintiff's contract/application as LCD loan consultant. DM firmly

represented to Plaintiff that DM was only a resource of business advice for LCD clients and credit

applicants. Again, these assertions by DM were false.

260.     The true facts were that DM did interfere, direct, and operate through WC to attack, challenge, alter, delay, neglect, deny plaintiff's credit application sponsored under authority of LCD board member defendant AW, and to coerce acceptance by plaintiff, evade suspicion, conceal true personal motives, biases, and motivations of discrimination and prejudice, with the intent of inducing failure in plaintiff's business venture should he submit to the coercion, plot, scheme, and duress of DM's interference.

262.     On or about March 1st, 2007, WC did communicate to plaintiff that DM had made the decision to deny plaintiffs contract of a $10,000 NORCAL FDC guaranteed business loan, and that DM did instruct WC to offer to plaintiff the "pick your own poison" scenario set up to induce failure in plaintiff's venture through alteration of the $10,000 amount to $2,500, even after a 3 month delay, whereas under-funding is a most common cause of failure for entrepreneurs - injected purposefully therein, on one hand of the conspiratorial scenario, and on the other hand, force plaintiff to prove to DM that plaintiff could meet his financial projections of his marketing plan that DM demanded of plaintiff, which is NOT a requirement for LCD applicants, for three months without the $10K funding that plaintiff requested, needed, and was contracted for in order to receive the $10K. This was and is an impossible and preposterous task – to start a business without capital, when the very reason the contract and engagement existed was for start-up capital in the first place! This "pick your own poison" scenario was a "deadly" condition that DM sought to utilize to induce failure in the plaintiff, and to evade and conceal said DM - sponsored and created conspiracy, plot, scheme, and malicious mechanizations from the plaintiff and all others.

263.     These elements were established by DM to evade suspicion and detection of DM's true motives, biases, motivations, prejudices, plot and schemes, interference, and self-dealing mechanizations with LCD clients.

264.    **7.) CONCEAL.** Concealment of the conspiratorial action alleged here as elements of the

defendants' conspiracy include the previous element of Evasion, but extends into the mysterious silence

that all parties maintain towards the affairs of DM, the original conspirator.


265.    EW NEVER responded to Plaintiff's detailed and comprehensive compliant or petition, and

sought to conceal his own negligent supervision and improper dealings of DM.


266.    DM NEVER responded to plaintiff's complaint or petition, or accusations, and sought to conceal

his wrong doings, which plaintiff has information and belief extend beyond the specific allegations

alleged in this complaint thus far.


267.    Upon demand that LCD provide plaintiff with the information, reasoning, and scoring method

into the reason for denial of plaintiff's contract on the stated basis of **"income insufficient for amount of**

**credit requested",** defendants ignored plaintiff's request and demand. Instead, the defendants sought to

conceal their negligent credit scoring system, credit application system, credit applicant evaluation system

because it is predisposed to just such discrimination and conspiracy.


268.    As a result of the above described actions and position of the defendants, the basis for any credit

amount determination was concealed from plaintiff even as he exercised consumer credit protection rights

by requesting and demanding to know and learn how the creditor/ defendant arrived at their decision of

adverse action, and specifically how the defendants arrived at the decision of stated amount or scenario -

the $2000 credit builder loan – that LCD presented as a new "opportunity" credit application.

269.     Even though the language offered by the defendants mentions an amount of $2,000 as a substitute for the contracted $10,000, after 5 months in this undue process of delay, the defendants had only stated that plaintiff should "re-apply" for an LCD loan of $2,000 in order to conceal their clear and blatant error on its face, that any reasonable person would observe, but conspiracy and wrong doing in truth.

270.     The very mention of at least a "low ball" amount gives the illusion of an offer or approval to speak of superciliously. This was done to satisfy and coerce AW to join their conspiracy as it was his contract that DM and WC challenged and denied on grounds in violation of the ECOA.

271.     AW communicated to plaintiff that he, and particularly AC, realized that they on behalf of LCD had violated the ECOA – calling it a "minor or incidental mistake"- in hopes of minimizing the perception of damage and violation by the plaintiff. AW sought to keep this violation and negligently supervised LCD credit evaluation system and operation concealed, and sought to keep his involvement from being discovered by authorities that monitor credit evaluation systems and applications. AW had the hope that plaintiff would join the defendants' conspiracy against himself.

272.     Multiple and ongoing conversations occurred between AW and AC on the subject of DM and WC.

273.     AW and AC must have known, or should have known the extent of DM's personal motives, biases, and motivations, and should have known DM's psychological disposition towards minorities, especially Hispanic-Americans, as a result of his divorce and child custody battle with his Hispanic-

American ex-wife. DM's attitude of "superiority" over minorities most certainly extended to AC who is Asian-American, a minority.

274.    DM is of the mindset of control, undue influence, and psychological domination over minorities which plays a significant factor influencing DM's role as Business Advisor to minorities, women, and other social and economically disadvantaged individuals for whom LCD was conceived and founded to serve.

275.    AW expressed fear or discomfort in contacting DM directly, explaining to plaintiff that he sought to avoid any discipline of AC's subordinate DM, even if said discipline could preserve and salvage the contract in which he executed with plaintiff.

276.    AW has an on-going and open professional relationship with AC, but not with DM.

277.    The mindset of psychological domination and privilege is a critical factor of racism and/or attitude of white privilege and/or supremacy, which DM displayed on January 4th, 2008 towards plaintiff in a first and only meeting which represents the "challenge" and antagonism factor as the first steps of the conspiracy as described and alleged.

278.    AC has been employed with LCD since its inception in 1993, where as DM came on board in or about late 2005, according to plaintiff's information and belief. Yet DM as business advisor acts under his own independent and un-fettered authority to approve or deny LCD loans based on his own personal