United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN LAWRENCE dba BRIAN LAWRENCE & ASSOCIATES (BLAA), <br><br>Plaintiff, <br><br>v. <br><br>LENDERS FOR COMMUNITY DEVELOPMENT(LCD), et al., <br><br>Defendant. | No. C 10-00619 CRB <br><br>**ORDER DISMISSING FOURTH AMENDED COMPLAINT** |

Plaintiff Brian Lawrence has sued a great many defendants, but chiefly the Opportunity Fund (formerly known as Lenders for Community Development[1]), a nonprofit that provides funding to minority businesses, alleging that it discriminated against him based on his race when it refused to give him a $10,000 small business loan. Plaintiff's Fourth Amended Complaint, his first drafted by counsel, suffers from the same fault as his first three: it is not plausible. Accordingly, the Court GRANTS the pending Motion to Dismiss, with prejudice.

//
//
//

---

[1] For the sake of clarity, this Order will refer only to the Opportunity Fund even when referring to the time in which the same organization was known as Lenders for Community Development.

## I.    BACKGROUND

Plaintiff's allegations are as follows.  He is an African-American male and the sole proprietor of Brian Lawrence & Associates, a private investigative company.  Cmplt. ¶ 6.[2]  Plaintiff asserts that he was "eligible, qualified, creditworthy, and collateral guaranteed to receive the loan and access to capital and business coaching and consultation services he sought from the defendants at Opportunity Fund."  Id. ¶ 33.

In mid-December 2006, Plaintiff met with Defendant Arthur Washington, a NORCAL FDC vice-president and board member of the Opportunity Fund.  Id. ¶¶ 34-43.  Plaintiff originally sought a $25,000 loan, as he hoped to convert "his self-employment into a small business which would generate over $100,000 in revenues per year."  Id. ¶ 36.  Washington encouraged Plaintiff to seek a $10,000 loan instead.  Id. ¶¶ 38-39.  Washington "considered Plaintiff's business proposal a strong candidate for start-up funding," and agreed to issue a collateral guarantee by NORCAL FDC to the Opportunity Fund.  Id. ¶ 37.  Plaintiff asserts that "[t]he only condition placed on Plaintiff was the completion of the Opportunity Fund's 'paperwork.'"  Id. ¶ 40.  That paperwork consisted of:

(1) a four page application,

(2) the previous year's personal income tax return,

(3) the last six months' bank statements, as well as (because his was an existing business)

(4) the previous two years' business income tax returns, and

(5) the current year's business income statement.  Id. ¶ 42.

Defendant Anthony Chang of the Opportunity Fund sent Plaintiff a loan application, which noted that the Opportunity Fund "typically provides an approval/decline within 2-3 weeks within meeting with Opportunity Fund Business Advisor."  Id. ¶ 46.  On December 26, 2006, Plaintiff met with the Opportunity Fund's loan consultant, Defendant William Cardenas, and "completed the Small Business Micro-Loan Application."  Id. ¶ 48.  His credit score was a 656.  Id. ¶ 49.

---

[2] All cites to the Complaint are to the Fourth Amended Complaint, unless otherwise noted.

2

Plaintiff provided the Opportunity Fund with 13 pages of financial information, including:

(1) the previous year's personal income tax return,

(2) the last six months of bank statements,

(3) the current year's bank income statements, and

(4) his 2005 business tax return. Id. ¶ 50.

He does not assert that he ever provided a second year's business tax return.

On January 4, 2007 Plaintiff claims that he "completed the final loan application requirement" by meeting with Opportunity Fund's business advisor, Defendant Devin McAlpine. Id. ¶ 51. McAlpine began the meeting by stating, "Don't just think you're gonna get this loan!" Id. ¶ 52. Plaintiff "explained that the loan was guaranteed by NORCAL FDC, and went on to describe the merits of his self-employment." Id. McAlpine told Plaintiff that he had "no marketing accumen," and declined to review Plaintiff's "comprehensive business plan," requesting a "shorter 'marketing plan' instead." Id. ¶¶ 52-54. The meeting lasted approximately ten minutes. Id. ¶ 55.

Following his meeting with McAlpine, Plaintiff hired a consultant to put together a marketing plan (even "suspend[ing] his income generating activities, rel[ying] on his credit cards during this time to survive, and focus[ing] all of his attention full time to this task of completing a marketing plan"), and unsuccessfully sought McAlpine's feedback and coaching on that marketing plan. Id. ¶¶ 57-59. In January 2007, Plaintiff received a $4,000 business credit loan from Citibank based on the same information he provided to the Opportunity Fund. Id. ¶ 61.[3] Plaintiff mailed the marketing plan to McAlpine and Cardenas on January 16, 2007. Id. ¶ 65.

On January 15, 2007, Cardenas requested that Plaintiff re-send the 2005 financial information, including a year 2005 profit and loss statement; Plaintiff "mailed and emailed

---

[3] Defendants assert that this was a business credit card and not a business loan, pointing to Plaintiff's assertion in the First Amended Complaint: "Plaintiff received a CitiBusiness Credit Card" with a spending limit of $4,000. See Reply at 5 (citing dckt. no. 1-1 ¶ 310). This correction is accurate but not very significant.

3

Mr. Cardenas's request along with an email communication for both Mr. McAlpine and Mr. Cardenas." Id. ¶ 68. Presumably this is Plaintiff's way of saying that he complied. If so, this is at odds with Plaintiff's assertion in the First Amended Complaint that in February (not January) 2007, Cardenas requested a copy of Plaintiff's 2006 (not 2005) personal tax return and a profit and loss statement for 2006, even though Cardenas had "the raw data in the 2006 banking statements from plaintiff on December 26th, 2006." See dckt. no. 1-1 at ¶ 204(v). In the First Amended Complaint, Plaintiff characterized those requests as "completely unreasonable," id. and made no mention of having complied with them.

Plaintiff did not hear whether the loan had been approved or declined within three weeks of when he contends that he completed the application (January 4, 2007). Id. ¶ 70. On February 28, 2007, he emailed Cardenas and McAlpine, exercising "his rights under the Consumer Credit Protection Act[, and] requesting his loan application status, noting the mishandling and delay in approving his application." Id. ¶ 72. Cardenas called Plaintiff on March 1, 2007 and informed him that "McAlpine was controlling the application process and influencing . . . Cardenas to delay the application process." Id. ¶ 73. Cardenas told Plaintiff that he could either reapply for a $2,500 loan or accept an additional delay of 3-4 months ro demonstrate whether he could meet the projections in his marketing plan. Id. at ¶ 74.[4] Plaintiff "demanded this choice present [sic] by Mr. Cardenas be sent to him officially and in writing, so that he might appropriately respond." Id. On March 20, 2007, the Opportunity Fund sent Plaintiff a Notice of Adverse Action officially rejecting his application based on a "lack of established earnings record and income insufficient for the amount of credit requested." Id. ¶¶ 75-76.

The Fourth Amended Complaint neglects to mention that in April 2007, the Opportunity Fund extended another offer of credit, offering Plaintiff an immediate $2,000 "credit builder" loan "right away," and stating that future loans were possible if Plaintiff's

---

[4] This description conflicts with Plaintiff's First Amended Complaint, which stated that the first option was to be granted a $2,500 loan "now," and the second option was to receive the $10,000 after 3-4 months of proving that he could meet the financial projections for his business. See dckt. no. 1-1 ¶ 208.

4

business performed well. See First Amended Complaint, dckt. no. 1-1 ¶¶ 222, 240-242. Plaintiff refused this proposal, which he considered "absolutely preposterous." Id. ¶ 256.[5]

Plaintiff then brought this suit, originally alleging both federal and state claims.

At the June 2010 hearing on the first Motion to Dismiss, the Court found Plaintiff's federal discrimination claims implausible, and was prepared to "dismiss the federal claims with prejudice and remand the state claims to state court." See dckt. no. 38 at 3:11-12. Plaintiff then asserted that he could amend the Complaint to add an allegation that the Opportunity Fund has a written policy in place, an "advertised policy," of not giving assistance to African-Americans. Id. at 5:11-24. The Court instructed Plaintiff to make sure that he has "alleged facts in good faith that will demonstrate that there is this written policy. That's the only amendment I'm giving you, not anything else. Just to amend to state that and give the facts in support of that proposition." Id. at 7:20-25.

Plaintiff amended and added nothing about such a policy. See [erroneously titled] Second Amended Complaint, dckt. no. 44. The complaint did, however, drop the state claims.

Then, at the September 2010 motion hearing, Plaintiff brought a lawyer. The Court told Plaintiff that he had one last chance to amend the complaint, and did not limit amendment to the existence of a written policy of discrimination. See dckt. no. 49.

Plaintiff has now filed a Fourth Amended Complaint, alleging violations of The Equal Credit Opportunity Act ("ECOA"), as well as racial discrimination under 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 1986. See Cmplt. ¶ 28. Defendants again move to dismiss, alleging that the Complaint contradicts Plaintiff's oral representation to the Court of a written policy of discrimination, that it violates the Court's narrow leave to amend, and that it fails to state a

---

[5] The Court may take judicial notice of the court's own records in prior, related litigation. See Amphibious Partners, LLC v. Redman, 543 1357, 1361-62 (10th Cir. 2008). Cf. Reddy v. Litton Indus., Inc., 912 F.2d 291, 296-97 (9th Cir, 1990) (amended complaint cannot allege facts inconsistent with the challenged pleading); Ellingson v. Burlington Northern, Inc., 653 F.2d 1327, 1329 (9th Cir. 1981) (court need not accept as true allegations in an amended complaint that contradict an earlier complaint without explanation).

5

claim.[6] See Mot. at 1. As an initial matter, though these first two allegations are true, neither is determinative. The leave to amend that the Court granted in September was broader than what it granted in June. Accordingly, this Order addresses only the plausibility of the discrimination and ECOA claims.

## II. ANALYSIS

### 1. Legal Standard

For a complaint to survive a motion to dismiss, the nonconclusory factual content of the complaint (plus reasonable inferences drawn from that content) must plausibly suggest a claim entitling the plaintiff to relief. See Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

> A claim has facial plausibility . . . when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Id. (quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009)). A complaint is not "plausible" if the conduct at issue is "more likely explained by" lawful behavior. Iqbal, 129 S. Ct. at 1950.

### 2. Discrimination Claims

Plaintiff alleges that Defendants' actions constitute racial discrimination under 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 1986. Each of these causes of action is based on the Opportunity Fund having denied Plaintiff a loan because of his race. In support of this contention, Plaintiff alleges:

(1) He is African-American. Cmplt. ¶ 6.

(2) The Opportunity Fund denied him a loan and financial services. Id. ¶¶ 75, 97.

(3) The Opportunity Fund's advertising prior to 2007 prominently featured African-Americans, but in 2007 it shifted its advertising to feature "various entrepreneurial

---

[6] The Motion also asks for an extension of time to file an Answer. The Court does not reach this request.

6

immigrants such as 'Anna, Owner of Vision Dance and Pilates Center, San Jose.'" Id. ¶ 88.

(4) The Opportunity Fund's "policy of reducing the number of loan[s] made to African-American entrepreneurs and businesses" led to a decrease in business loans to African-Americans from 31% to 10%." Id. ¶ 88.

(5) "[D]efendants have regularly provided loans to white applicants, immigrants, and Hispanics who have generally similar profiles as the plaintiff regarding credit worthiness, bank-ability, and low income financial backgrounds." Id. ¶ 91.

These allegations are insufficient to state a claim.

First, Plaintiff's allegations as to the racial focus of the Opportunity Fund's advertising are both conclusory and weak. Plaintiff states simply that the Opportunity Fund's website replaced images of African-Americans clients with images of immigrant clients. Cmplt. ¶ 88. Assuming this is true, it provides paltry support for the allegation that Plaintiff was denied a loan because of his race. Compare U.S. v. Hazelwood School Dist., 534 F.2d 805, 811 (8th Cir. 1976) (involving advertisements for "white only" teachers).

Next, Plaintiff has jumbled two different statistics in order to claim that loans to African-American business are down from 31% to 10%. See Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987) (court may disregard allegations in complaint that are contradicted by exhibits attached to the complaint). The 31% number comes from the Opportunity Fund's 2004 website, which states that 31% of the Opportunity Fund's small business loans went to African-Americans. See Cmplt. ¶ 125 ("The businesses we serve" - November 2004); Mot. Ex. A (historical printout of 2004 website listing 31% number on page relating to Small Business Micro-Loan Program).[7] The 10% number comes from the Opportunity Fund's 2007 website, and specifically a segment titled "Who We Serve." See Second Amended Complaint, dckt. no. 44, at 32. That exact same page of the 2007 website, also included in the Second Amended Complaint, goes on to state that the Bay Area Micro-

---

[7] The Court takes judicial notice of this document as it was referenced in the Complaint. See Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).

7

1 finance fund provided 27% of its loans to African-American owned businesses.  Id.
2 Therefore, in 2004 the Opportunity Fund made 31% of its loans to African-American
3 businesses, and in 2007 it made 27%– not 10%-- of its loans to African-American
4 businesses.  Even if it were accurate that the Opportunity Fund was making 10% of its loans
5 to African-American businesses, this would still (1) belie Plaintiff's assertion of a policy
6 (written or otherwise) against loaning to African-Americans and (2) mean that the
7 Opportunity Fund was lending to African-Americans at a percentage 149% times the
8 percentage of African-Americans in the California population in 2008.  See
9 http://quickfacts.census.gov/qfd/states/06000.html (last visited Mar. 17, 2010) (showing
10 percentage of African-Americans in California population at 6.7%).

11       In addition, Plaintiff's allegation that the Opportunity Fund regularly provides loans to
12 "white applicants, immigrants, and Hispanics" with like profiles, Cmplt. ¶ 91, finds no
13 factual support in his Complaint.  The paragraphs following this assertion list five examples
14 of successful loan recipients culled from various news reports and one postcard (for example,
15 "Svetlana Teran, a Russian immigrant was granted a $15,000 business loan by the defendants
16 to open up a dance studio in Mountain View," and "'Juan Carlos, originally from Mexico'
17 received $2,500 from the Defendants to sell shows and clothing part-time") and then asserts
18 that "[n]one of the above individual examples of the favored race, color, class, social and
19 immigration status, and national origin, were, by their own admission, creditworthy or
20 guaranteed before receiving financial services and capital from the defendants, yet all
21 received capital and financial services, whereas Plaintiff, because he was African-American,
22 male, and a US Citizen, was denied. . . ."  Id. ¶¶ 92-97.  These "examples" do not show that
23 the individuals were less worthy of the loans than Plaintiff; Plaintiff does not include enough
24 information about each example to make a meaningful comparison.

25       Accordingly, there are only threadbare and conclusory allegations suggesting that
26 Plaintiff was denied a loan because of his race.

27       On the other hand, there is a far more likely explanation: Plaintiff was denied a loan
28 because of a "lack of established earnings record and income insufficient for the amount of

8

credit requested." See Cmplt. ¶¶ 75-76. That Plaintiff had a credit score of 656, id. ¶ 49, or that Citibank chose to give Plaintiff either a loan or a credit card worth $4,000 around this same time, id. ¶ 61; dckt. no. 1-1 ¶ 310, does not render his Complaint plausible. Despite Plaintiff's assertions (e.g., "the only condition placed on Plaintiff was the completion of Opportunity Fund's paperwork," Cmplt. ¶ 40; "Plaintiff had every expectation, that his business credit application would certainly be approved. . . . No antagonism or animosity present, only encouragement," id. ¶ 127), Defendants were not obligated to give Plaintiff a loan; they were only obligated to deal with him in a non-discriminatory manner.

Importantly, Plaintiff did not provide the Opportunity Fund with a second year's business tax return. See Opp. at 6 (conceding that 2006 tax return was not provided but arguing that provision of a second return was unreasonable due to timing). In addition, the Opportunity Fund reasonably requested additional information. See id. at 7 (conceding that the Opportunity Fund "requested more financial information" when Cardenas requested that Plaintiff re-send the 2005 financial information); see also dckt. no. 1-1 at ¶ 204(v) (assertion in First Amended Complaint that in February 2007 Cardenas requested a copy of Plaintiff's 2006 personal tax return and a profit and loss statement for 2006).

Moreover, the Opportunity Fund did not deny Plaintiff any funding whatsoever. It apparently offered Plaintiff a choice between a $2,500 loan or his requested $10,000 after 3-4 months of meeting the projections in his marketing plan. See dckt. no. 1-1 ¶ 208. The Fund later offered him a $2,000 "credit builder" loan. Id. at ¶¶ 222, 240-242. Though these options were not what Plaintiff was hoping for, they undermine the notion of a discriminatory denial of funds.

In light of the Opportunity Fund's obvious attempts to work with Plaintiff and their offers of credit, Plaintiff's allegations of discrimination are not plausible. See Moss, 572 F.3d at 969. The only reasonable inference to be drawn from the facts in the Complaint is that the Opportunity Fund refused to provide Plaintiff with the full $10,000 he requested not because of a policy– written or otherwise– of discrimination, but because it was concerned

that Plaintiff lacked sufficient income to repay the loan. Plaintiff has failed to allege a plausible alternative explanation. His discrimination claims therefore fail.[8]

### 3.  Equal Credit Opportunity Act Claim

For these same reasons, Plaintiffs' discrimination claim under the ECOA is also not plausible. See Cmplt. ¶ 110.[9]

Finally, Plaintiff also alleges that the Opportunity Fund violated the ECOA by:

(1) Willfully refusing to accept and consider relevant information offered by Plaintiff for credit application;

(2) Failing to respond to Plaintiff's continual requests inquiring into the status of his credit application;

(3) Failing to notify Plaintiff of adverse action within 30 days of the completed application;

(4) Failing to disclose to Plaintiff the right to request reasons for the adverse action;

(5) Failing to disclose that Plaintiff could make a complaint to the FTC; and

(6) Failing to disclose the current and proper address of the regulatory agency responsible for administering compliance.

Cmplt. ¶ 105.

However, the Court finds that the requirements of 15 U.S.C. § 1691 were never triggered, because Plaintiff never completed his loan application. An application is "completed" when the creditor has received all of the information that it regularly obtains and considers in evaluating applications. See 12 C.F.R. § 202.2(f); Dufar v. Bank of

---

[8] Some also fail for other reasons. For example, Plaintiff fails to point to a contractual relationship at issue for his § 1981 claim. See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006). In addition, while Plaintiff alleges that the Opportunity Fund acted "under the color of law," Cmplt. ¶ 137, he fails to allege any facts that would support a finding that the Opportunity Fund, a private entity, was acting under color of state law as required under § 1983. See Haywood v. Drown, 129 S.Ct. 2108, 2111 (2009).

[9] Alleging that the Opportunity Fund violated ECOA because (1) Plaintiff is an African-American; (2) Plaintiff's credit application was creditworthy; (3) Defendants rejected Plaintiff's credit application; (4) Defendants had a pattern and practice of discriminating against African-Americans; (5) Defendants extended credit to like applicants who were not African-American; and (6) Plaintiff suffered severe injury as a result of the denial of credit.

America, 94 F.3d 561, 564 (9th Cir. 1996). Here, the Opportunity Fund's paperwork included the previous two years' business income tax returns, Cmplt. ¶ 42, and Plaintiff conceded that he did not provide a 2006 tax return, Opp. at 6. Accordingly, Plaintiff's application was never completed as defined by the relevant regulations, and so the Opportunity Fund did not violate ECOA.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion to Dismiss. As this is Plaintiff's Fourth Amended Complaint, the Court does so with prejudice.

**IT IS SO ORDERED.**

Dated: November 29, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE